UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JEREMIAH BRINSON,

                Petitioner,                   **DECISION AND ORDER**
                                                    No. 01-CV-0405

     -vs-

HANS WALKER,

                Respondent.

_____

## INTRODUCTION

Petitioner, Jeremiah Brinson ("Brinson"), filed this *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Ontario County Court on

charges of first degree robbery (N.Y. Penal Law § 160.15(3)) and third degree criminal

possession of a weapon (N.Y. Penal Law §265.02(1)). The parties have consented to disposition

of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Brinson's conviction stems from the alleged robbery of Jeremy M . Gavin ("Gavin").

Gavin, the complainant and the sole witness to the crime, testified that at about 1:30 a.m. on May

28, 1997, he was walking down Main Street in the City of Geneva after leaving a local bar, the

Rum Runner. T.43.[1] According to Gavin, a black man whom he did not know approached him

and asked if he could spare a few dollars. T.44. Gavin stated that as he was attempting to extract

a few bills from his wallet, the man grabbed at the wallet. T.45. Gavin testified that he "tried to

---

[1] Citations to "T.__" refer to the trial transcript.

defensively push him away" but "ended up sprawled on the ground." T.45. Gavin related that the

man then pulled out a razor knife, raised it up about shoulder-height, bent down, picked up the

money that had fallen out of the wallet (about $60) and started to walk away. T.46-47. Gavin

stated that as the man drew the knife from his pocket, a piece of paper fell out; this turned out to

be Brinson's Social Security card which Gavin brought to the police station when he reported the

crime. Gavin testified that he followed his assailant "for a little while" but "gave it up" because

he "figured it was pretty much a lost cause" and he "didn't want to get hurt." T.48. Gavin

described the person who robbed him as a black man wearing jeans, a white sweatshirt and a

black baseball cap. T.52.

Shortly thereafter, Officer Mark Cirone ("Cirone") observed Brinson about one-tenth of a

mile from the alleged robbery scene.  Since Brinson matched the description given by Gavin,

Cirone transported him to the police station where Gavin identified Brinson at a show-up

identification procedure. The police found Brinson to be in possession of a razor knife which

Gavin eventually identified as the knife with which he was threatened.  However, Brinson did not

have any money on him. Brinson's Social Security number was confirmed during the arrest

procedure; it was the same number as the one on the card Gavin claimed fell out of the robber's

pocket. *See* T.91-112.

Brinson's version of the events of that evening as told by him and his supporting witness

was poles apart from Gavin's version. Defense counsel called Joel Richardson ("Richardson")

who testified that on the night of the incident, he was driving around downtown Geneva with

Brinson and Shawn Dunson ("Dunson"). T.126. As they passed by the Rum Runner, a "white

dude" asked if he could get a ride to Pulteney Street. They agreed, and the man got into the car.

According to Richardson, the man never identified himself. T.126. Richardson testified that he asked the passenger for gas money, but the man said that he did not have any. T.127. Richardson then dropped the man off and drove away. Defense counsel did not ask Richardson whether the white man to whom he had given a ride was present in the courtroom. The prosecutor then moved to have the testimony stricken in its entirety, and the court agreed. Defense counsel did not object or attempt to recall the witness. T.128.

Next, Brinson testified that as he was driving around with Richardson and Dunson, they encountered Gavin coming down the street. T.137. According to Brinson, Gavin came up to him and said, "[C]ould you hook me up with a dime bag of weed[?]" T.138. Gavin explained that he and his girlfriend had just broken up, and his "connection" was out of town. T.138. According to Brinson, Gavin got into the back seat of Richardson's car and sat next to Brinson.  Brinson explained that he had taken his razor knife out of his back pocket and placed it on the car seat because he could not sit on the knife and was afraid of breaking it. T.141. Brinson testified that he used the knife, which he called a "carpet cutter" at his job at the Ramada Inn. T.141. When they got to Pulteney Street, Brinson got out of the car and put the knife back in his pocket. Gavin said he could only get a "nick" (a nickel bag) because he only had $5.  At that point, Brinson became suspicious that Gavin was a "narc" and said, "[G]et away from me, man, I'm going home." T.142. Brinson then started to walk to his sister's house on Pulteney Street. According to Brinson, Gavin started following him saying, "[J]ust go half with me . . . . all I want to do is get high . . . I'm having a bad night." T.143. At that point, Brinson spied a police car and was worried what the police would think if they saw a "black and white guy [sic] walking around" at that late hour. T.144. Brinson testified that Gavin, who was still following him, "made some kind

of motion" to the police. Brinson said to Gavin, "[Y]ou are a narc, aren't you" and kept walking

hurriedly away. T.144. Gavin then yelled after him, "[Y]ou Nigger, come here, Nigger[.]" T.145.

Brinson testified that he was walking home when a police car pulled up and an officer took him

into custody because he fit the description of the perpetrator of a robbery that had been reported

earlier.

     Brinson also testified that he had lost his Social Security card approximately one month

prior to the incident, and that he had requested and been re-issued a new one because he needed

identification for his job at the Ramada Inn, where he was employed at the time of the incident.

T.150. Brinson claimed that he did not have the new card on his person that night.T.150-51. He

also testified that the card found at the scene and introduced into evidence was the card that had

been missing for a little over a month. T.174. He admitted that the card appeared to be in the

same condition as when he had lost it. T.174-75.

     The jury convicted Brinson of both counts of the indictment. On the robbery charge, he

was sentenced to a determinate term of imprisonment of eighteen years with a five-year

concurrent sentence on the criminal possession charge.

     On direct appeal, the Appellate Division of New York State Supreme Court unanimously

affirmed his conviction on October 1, 1999. *People v. Brinson*, 265 A.D.2d 879, 697 N.Y.S.2d

221 (App. Div. 4th Dept. 1999). The New York Court of Appeals denied leave to appeal on

December 3, 1999. *People v. Brinson*, 94 N.Y.2d 860, 725 N.E.2d 1097, 704 N.Y.S.2d 535

(N.Y. 1999).

     Represented by counsel, Brinson collaterally attacked his conviction by means of an

application pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 in the trial court.

Counsel argued that trial counsel was ineffective in failing to demand a hearing pursuant to

*United States v. Wade*, 388 U.S. 218 (1967), to suppress Gavin's identification of Brinson on the

basis that the show-up identification procedure conducted at the police station was inherently

suggestive. Counsel also argued that trial counsel should have asserted that Brinson's arrest was

without probable cause; should have introduced documentation from the Social Security

Administration that Brinson had requested a new Social Security Card prior to the date of the

alleged robbery; and failed to properly question defense witness Joel Richardson, which led to

the striking of Richardson's testimony on motion of the prosecutor.  This motion was denied on

January 6, 1999 without opinion in a summary order. It appears that counsel filed a notice of

appeal, but apparently leave to appeal the denial of the C.P.L. § 440.10 motion was not sought.

In January 2001, represented by counsel, Brinson challenged the effectiveness of his

appellate counsel in an application for a writ of error *coram nobis* and argued that the

prosecutor's cross-examination of him was improper. This application was summarily denied by

the Appellate Division on May 2, 2001. Brinson's habeas petition followed on June 7, 2001.

During the petition's pendency, Brinson filed another *coram nobis* application on November 9,

2001; it was denied on April 26, 2002.

As grounds for habeas relief, Brinson states that he "relies on the issue's [*sic*] within his

direct appeal dated January 14, 1998. The issue's [*sic*] within his C.P.L. 440.10 Motion dated

December 30, 1998. And the issue's [*sic*] within his Motion for Writ of Error Coram Nobis dated

January 18, 2001. For Federal Habeas corpus review . . . ." Upon review of the foregoing

pleadings, the Court concludes that Brinson has raised the following grounds for federal habeas

relief: (1) improper limitation of cross-examination; (2) denial of effective assistance of trial

counsel; (3) prosecutorial misconduct on summation; (4) harsh and excessive sentence and vindictive sentence; (5) insufficiency of the evidence with regard to the charge of first degree robbery; (6) and ineffective assistance of appellate counsel. Respondent answered the petition and interposed the defenses of untimeliness[2] and non-exhaustion. For the reasons set forth below, the petition is granted.

## II.   DISCUSSION

### A.   Exhaustion

Respondent raises the defense of non-exhaustion with regard to a number of Brinson's claims. In particular, respondent argues that the ineffective assistance of counsel claims and the claim of newly discovered evidence[3] brought in support of the C.P.L. § 440.10 motion are not exhausted because Brinson failed to appeal the denial of the motion and therefore did not complete one full round of state court review as to those issues. *See Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995). Respondent also contends that Brinson's claims of prosecutorial misconduct and evidentiary insufficiency are unexhausted because Brinson failed to fairly present these claims in federal constitutional terms to the state courts for review.

With respect to the C.P.L. § 440.10 claims, I note that Brinson raised the exact same claims, almost verbatim, on his earlier direct appeal. Thus, the claims raised on the C.P.L. §

---

[2] In its memorandum of law, respondent makes no argument regarding the alleged untimeliness of Brinson's habeas petition. The Court has reviewed the relevant documentation and concludes that Brinson timely filed his petition. *See also* Docket #6.

[3] Based upon this Court's reading of the papers submitted, it appears that the claim of newly discovered evidence actually was not brought as a stand-alone claim but rather as one of the grounds for petitioner's ineffective assistance of counsel claim, raised both on direct appeal and in support of the C.P.L. § 440.10 motion.

440.10 motion have been through one full round of appellate review in state court: they were raised before the appellate division on direct appeal, and leave to appeal was sought with respect to them. Therefore, respondent is incorrect in its assertion that the claims are unexhausted. For some reason, in denying the C.P.L. § 440.10 motion, the county court did not rely on C.P.L. § 440.10(2)(a) which provides that a court *must* deny a § 440 motion when the issues raised therein were previously determined on the merits upon direct appeal. N.Y. Crim. Proc. Law § 440.10(2)(a). Had the county court done so, the claims arguably would have been procedurally defaulted. However, the county court denied them on the merits, so the Court must consider them here.

With respect to Brinson's claims of prosecutorial misconduct and insufficiency of the evidence, it is true, as respondent claims, that counsel did not explicitly cite federal law in support of his arguments. However, a habeas petitioner has a number of ways to fairly present a claim in state court without citing "chapter and verse" of the Constitution, including "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Daye v. Attorney General of New York*, 696 F.2d 186, 194 (2d Cir. 1982) (*en banc*); *accord, e.g.*, *Strogov v. Attorney General*, 191 F.3d 188, 191 (2d Cir. 1999).

Turning first to the insufficiency-of-the-evidence claim, the test for sufficiency of the evidence to support a conviction is the same under both New York and federal law. *Compare Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (holding that, when evaluating a federal habeas

petitioner's challenge to the sufficiency of the evidence the question for the court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") *with People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 763 (N.Y. 1987) ("For a court to conclude . . . that a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged.") (internal citation omitted).  As such, the method of analysis to be used in deciding the federal claim was readily available to the state court. *Bisaccia v. Attorney Gen'l of the State of New Jersey*, 623 F.2d 307, 310 (3d Cir.), *cert. denied*, 449 U.S. 1042, 101 S. Ct. 622, 66 L. Ed.2d 504 (1980). Consequently, I conclude that Brinson "fairly presented" his evidentiary insufficiency claim to the state courts. *See Strogov*, 191 F.3d at 193 (citing *Evans v. Court of Common Pleas*, 959 F.2d 1227, 1231-33 (3d Cir. 1992) (citing *Daye* with approval and finding exhaustion where petitioner had presented a state claim of insufficient evidence to the state courts and then raised a functionally equivalent federal constitutional claim of insufficient evidence on her habeas petition)).

I likewise agree with Brinson that the prosecutorial misconduct claim is exhausted as well. Appellate counsel cited state court cases which in turn relied upon federal constitutional decisions in order to analyze a defendant's claim that the prosecutor's misconduct denied him a fair trial. *See* Petitioner's Appellate Brief at 18 (citing, *e.g.*, *People v. Tassiello*, 300 N.Y. 425, 430 (1950) ("Knowing, as we do, that statements, such as those now challenged, addressed to a

jury by a prosecuting officer in the trial of a criminal case 'are apt to carry much weight against the accused when they should properly carry none' . . .") (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Indeed, New York's case law proscribing certain behavior by the prosecution is grounded in Fifth Amendment due process concerns. *See*, *e.g.*, *People v. Crimmins*, 36 N.Y.2d 230, 237, 367 N.Y.S.2d 213, 326 N.E.2d 787 (1975) (comment of the prosecutor in summation with respect to defendant's failure to testify on her own behalf was improper and constituted constitutional error under the Fifth Amendment of the Federal Constitution and Article 1, § 6 of the New York State Constitution). I note that appellate counsel also cited *People v. Crimmins*, *supra*, in his brief. Moreover, the facts alleged by Brinson are "well within the mainstream of constitutional litigation," *see Daye*, 696 F.2d at 194, as petitioners routinely raise similar claims of prosecutorial misconduct as grounds for habeas relief.

Respondent does not assert the defense of non-exhaustion with respect to the remainder of Brinson's claims, and indeed, they appear to be fully exhausted and properly before the Court on habeas review.

## B.    Standard of Review

To prevail under 28 U.S.C. § 2254, as amended in 1996 by the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1219, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication on the merits of his federal constitutional claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v.*

*Taylor*, 529 U.S. 362, 375-76 (2000).

**C.     Merits of the Petition**

>    **1.      Ineffective assistance of trial counsel and appellate counsel**

>>     **a.      Legal Standard**

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-part test. First, a petitioner must demonstrate that counsel's performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second, a petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, a petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different. *Id.* at 694.  The issue of prejudice need not be addressed, however, if a petitioner is unable to demonstrate first that his counsel's performance was inadequate. "[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

A claim for ineffective assistance of appellate counsel is evaluated upon the same standard as is a claim of ineffective assistance of trial counsel.  *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993)).  A petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was objectively unreasonable in failing to raise a particular issue on

appeal, and that absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful. *Mayo*, 13 F.3d at 533-34; *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir. 2001).

Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins,* 528 U.S. at 288 (citing *Jones v. Barnes,* 463 U.S. 745, 750-54 (1983)); *accord, e.g.,* Sellan v. Kuhlman, 261 F.3d 303, 317 (2d Cir.2001) ("This process of 'winnowing out weaker arguments on appeal and focusing on' those  more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."). The habeas court should not second-guess the reasonable professional judgments of appellate counsel as to the most promising appeal issues.  *Jones*, 463 U.S. at 754; *see also Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). Thus, a petitioner may establish constitutionally inadequate performance only by showing that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo,* 13 F .3d at 533.

### b.    Alleged Grounds of Trial Counsel's Ineffectiveness

Brinson contends that trial counsel was ineffective for (1) failing to demand a *Wade* hearing to challenge the use of the show-up identification procedure; (2) failing to demand a suppression hearing to controvert the legality of defendant's arrest and the seizure of evidence from his person; (3) failing to obtain and introduce evidence consisting of a Social Security card application; and (4) calling a witness whose testimony ultimately was stricken in its entirety. *See* Petitioner's Brief on Direct Appeal at 13-16.

### i.      Failure to demand *Wade* hearing

At trial, counsel did not pursue a defense of misidentification, so the issue of identification was not pertinent. In fact, Brinson never denied having had an encounter with the complainant. Rather, he took the stand at trial and testified to a different version of events–that the complainant had attempted to buy drugs from him. Brinson positively identified the complainant as the person who had tried to buy a "dime bag of weed" from him on the night of the alleged robbery. Given counsel's chosen defense strategy of disputing what actually occurred, it was reasonable for counsel to decide not to challenge the complainant's identification of Brinson.

### ii.      Failure to controvert the legality of the arrest

Brinson's claim that counsel was ineffective for failing to request a suppression hearing to contest the legality of his arrest is without merit. "In order to show ineffective assistance for the failure to make a suppression motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375-76 (1986)). Other than his bare assertion that his arrest was without probable cause, Brinson has never alleged on what basis counsel should have moved to suppress. In this case, it is apparent that probable cause existed to arrest Brinson: his physical appearance and clothing matched the description given by the complainant; he was found in the vicinity of the crime shortly after it had occurred; he admitted to having had an encounter with the complainant, albeit one with a different version; and his identity matched the

name on the Social Security card picked by the complainant at the crime scene. Given these facts, a suppression hearing most likely would not have had a favorable outcome for Brinson.

### iii.   Failure to introduce evidence

Brinson claims that trial counsel was ineffective because he failed to obtain and introduce evidence that Brinson had requested a new Social Security card prior to the alleged robbery. Brinson contends that this "newly discovered evidence" would have bolstered his argument that he had lost his Social Security card before the incident and therefore could not have dropped it at the scene of the crime. At trial, Brinson testified that the last time he saw his Social Security card was "probably a month before" the incident occurred. T.150. He then testified that he "went and got another one, a brand new one, made, in which that was made probably a month before this incident," because he needed new identification for his job at the Ramada Inn, where he was employed at the time of the incident. *Id.* Brinson denied that the Social Security card introduced into evidence was his replacement card. T.150-51.

The evidence that Brinson claims should have been introduced consists of an application to, and documentation from, the Social Security Administration ("SSA") regarding Brinson's request for a new card. In particular, there is a letter from the SSA which states that "[a] social security replacement card action was done for above [Brinson] on 5/4/97. A new card should have been received within 7-10 days from that date." This evidence could have assisted Brinson's defense, even though it was additional proof that Brinson could have received a new Social Security card by the time of the incident because it would have permitted him to argue that the lost card could have come into possession of the victim during his presence in the vehicle in

which Brinson said he was riding.  After all, such a theory is no more implausible than the one

offered by the victim (whose credibility is subject to serious question as will be later discussed),

that the card just happened to fall out of Brinson's pocket on the street–an extraordinarily

coincidental piece of luck for the victim. Furthermore, Brinson's failure to produce the

replacement card is insufficient to discount this omission by his trial counsel. While this Court

cannot say for certain that there would have been a reasonable likelihood this evidence would

have changed the outcome of his trial, and while the Court is unwilling to find that the failure to

present corroborating proof that Brinson applied for a replacement card amounted to ineffective

assistance of counsel, it is one of many troubling defects in Brinson's trial, which cumulatively

create a substantial doubt that he received a fair trial in the circumstances.

### iv.  Mishandling of a witness's testimony

Brinson faults counsel for calling a witness, Joel Richardson, whose testimony was

stricken in its entirety. Richardson testified that when he and Brinson were driving around town

on the night of the incident, they picked up an unnamed "white dude" in front of a bar who asked

for a ride. When the man was unable to contribute any gas money, Richardson dropped him off

and drove away. That was the extent of Richardson's testimony, which corroborated Brinson's

testimony to the extent that Brinson stated that they picked up Gavin, who is white, and gave him

a ride.  However, Richardson never identified the "white dude." Upon motion by the prosecutor

that the evidence was not relevant, the trial court struck Richardson's testimony. Defense counsel

did not object or seek to recall Richardson to the stand, which suggests that Richardson may not

have been able to identify Gavin, but that it is immaterial. While the Court agrees with Brinson

that defense counsel did not handle the witness in a particularly competent fashion, this Court is

unwilling to conclude that it amounted to constitutionally ineffective assistance.

Notwithstanding defense counsel's failure to object, the trial court should not have excluded the evidence even in the weak form introduced by counsel. First of all, "[i]t is well settled that evidence is relevant if it has any 'tendency in reason to prove any material fact[.]'" *People v. Mateo*, 2 N.Y.3d 383, 424-25, 779 N.Y.S.2d 399, 425 (N.Y. 2004) (quoting *People v. Alvino*, 71 N.Y.2d 233, 241, 525 N.Y.S.2d 7, 519 N.E.2d 808 (N.Y.1987)). It does not matter that Richardson did not identify the victim or whether he could or could not identify the victim.[4] Rather, the mere fact that the presence of a white male in the automobile at or about the time of the incident reasonably tended to corroborate Brinson's account of the incident.  By excluding such evidence, the trial court eviscerated a substantial portion of Brinson's factual defense by preventing corroboration of Brinson's testimony on this point. Such exclusion made it extremely difficult for Brinson to argue an alternative scenario and prevented his counsel from arguing the complainant's possible motive for testifying falsely. When coupled with the critical evidentiary errors committed by the trial court, the cumulative effect of these errors create a disturbing picture and a substantial doubt that petitioner received a fair trial in the circumstances.

### c.    Alleged grounds of appellate counsel's ineffectiveness

In his 2001 *coram nobis* application, Brinson's counsel argued that counsel on direct appeal was ineffective in failing to argue that the prosecutor's cross-examination was a "highly intemperate character assault" and improper. *See* January 2001 Application for a Writ of Error

---

[4] Richardson might not have had an opportunity to identify the complainant at trial, since it is doubtful he was in the courtroom at the time of Richardson's testimony. It would have been better practice for defense counsel to have asked the trial court that a photograph of the complainant be shown to the witness or that an in-court identification take place, but the record is devoid of such effort.

*Coram Nobis* at 3 *et seq.*, attached as Exhibit A to Respondent's Reply Declaration (Docket #20). The Appellate Division summarily rejected Brinson's arguments. I note that although appellate counsel did not raise this issue, he did present a thorough argument concerning the prosecutor's misconduct on summation.

Brinson testified to his lengthy criminal history on direct examination, and the prosecutor was entitled to attempt to impeach Brinson's credibility by inquiring into those matters on cross-examination. As to the prosecutor's cross-examination about the drug paraphernalia found on Brinson's person, Brinson offered on direct examination that the police found a "stem" (crack pipe) in his pocket, tested it and "charged him with that." T.149. When the prosecutor asked whether the stem had been used for using crack cocaine, the court sustained defense counsel's objection. T.168. The prosecutor then questioned Brinson over defense counsel's objection about where he had obtained the stem. However, the court sustained defense counsel's objection when the prosecutor asked Brinson, for the second time the name of the person who had given him the stem. T.170. Upon my review of the record, I find that the prosecutor's questioning of Brinson was overly aggressive and improper, because it appears to have created an inference, although subtle, that Brinson was covering for someone who had engaged in the sale of drugs.  Such inferences, created by a prosecutor who should know better, are often slipped in with full knowledge that an objection to them will be sustained, but with the awareness that they will be suggestive to the factfinder and create cumulative damage.

Although appellate counsel could have included this as another ground in support of his prosecutorial misconduct argument, it was not unreasonable for him to omit it. Brinson was not prejudiced since, in all likelihood, that additional ground would not have "tipped the scales" in

his favor on direct appeal.

### 2.    Harsh and Excessive Sentence/Vindictive Sentence

### a.    Vindictive Sentence

With respect to Brinson's vindictive sentencing claim, I note that the difference between the offered sentence (seven years) and the imposed sentence (eighteen years) does not make out a claim of actual vindictiveness because the judge never stated or implied that the sentence was based on Brinson's refusal of the plea offer.  *See Naranjo v. Filion*, 2003 WL 1900867, at *10 (S.D.N.Y. Apr. 16, 2003) (denying habeas claim based on disparity between pre-trial offer of five to ten years and ultimate sentence of twenty-five to fifty years; such difference did not establish claim of actual vindictiveness because judge never suggested that sentence based on refusal of plea offer). The mere fact that the trial court, following conviction, imposed a high sentence does not, in and of itself, establish "actual vindictiveness." *See id.* (citing, *inter alia*, *Corbitt v. New Jersey*, 439 U.S. 212, 219, 223 (1978) ("We have squarely held that a State may encourage a guilty plea by offering substantial benefits in return for the plea. . . . We discern no element of retaliation or vindictiveness against [appellant] for going to trial. There is no suggestion that he was subjected to unwarranted charges. Nor does this record indicate that he was being punished for exercising a constitutional right. . . . There is no doubt that those homicide defendants who are willing to plead *non vult* may be treated more leniently than those who go to trial, but withholding the possibility of leniency from the latter cannot be equated with impermissible punishment as long as our cases sustaining plea bargaining remain undisturbed."); *Chaffin v. Stynchcombe*, 412 U.S. 17, 31 (1973); *United States ex rel. Williams v. McMann*, 436 F.2d 103,

106-07 (2d Cir. 1970), *cert. denied*, 402 U.S. 914 (1971); *Bailey v. Artuz*, 1995 WL 684057, at

*2 (N.D.N.Y. Nov. 15, 1995) ("[A] sentencing judge does not show vindictiveness . . . by

sentencing a defendant who, after withdrawing his plea of guilty to a lesser offense carrying a

lower penalty, has then been convicted of a more serious offense to the higher penalty authorized

. . . [Petitioner] has offered no evidence of vindictive sentencing beyond the fact of the plea

bargain offered to him and the actual sentence he received. . . . Therefore, [petitioner] has not

made out a claim of constitutionally impermissible vindictive sentencing.")).

### b.      Harsh and excessive sentence

A petitioner's assertion that a sentencing judge abused his discretion in sentencing is

generally not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre*, 548

F.2d 1102, 1109 (2d Cir. 1977) (petitioner raised no cognizable federal claim by seeking to prove

that state judge abused his sentencing discretion by disregarding psychiatric reports) (citing

*Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The [petitioner's] sentence being within the

limits set by the statute, its severity would not be grounds for relief here even on direct review of

the conviction, much less on review of the state court's denial of habeas corpus.")). A challenge

to the term of a sentence does not present a cognizable constitutional issue if the sentence falls

within the statutory range.  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992).

Here, Brinson, a second felony offender, was convicted of one count of first degree

robbery (a class B felony), and one count of third degree criminal possession of a weapon (a class

D felony). *See* N.Y. Penal Law §§ 160.15(3), 265.02(1). He was sentenced to eighteen years on

the robbery charge with a concurrent term of five years on the weapons possession charge. Under

-18-

New York law, the maximum sentence for a class B felony is twenty-five years; for a class D

felony, it is seven years. *See* N.Y. Penal Law § 70.00(2)(b), (d). Taking his second felony

offender status is taken into consideration, Brinson's determinate sentence of eighteen years did

not exceed the maximum sentence authorized for these offenses. *See* N.Y. Penal Law §

70.06(1)(a), (2), (3)(b) ("For [a second felony offender convicted of] a class B felony, the term

must be at least nine years and must not exceed twenty-five years[.]"). Therefore, this claim is

not cognizable on habeas review.

### 3.    Insufficiency of the Evidence

On habeas review, a court is not permitted to "'make its own subjective determination of

guilt or innocence.'" *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir. 1999) (quoting *Herrera*

*v. Collins,* 506 U.S. 390, 402 (1993)). A conviction will be found to be supported by sufficient

evidence if, "'after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt.'" *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S.

307, 319 (1979)) (emphasis in original). Accordingly, a habeas petitioner bears a "heavy burden"

in challenging the sufficiency of the evidence supporting his conviction. *Id.*

Gavin, the complainant, testified that at about 1:30 a.m., he was approached on the street

by a black man, who was about five feet, ten inches tall, and was wearing a white sweatshirt, blue

jeans, and a black baseball cap. The man asked if Gavin could spare a few dollars. As Gavin was

trying to extract a few bills from his wallet, the man attempted to grab the wallet. Gavin tried to

push him away, but ended up on the ground, along with his wallet. The man pulled a razor knife

out of his right-hand front pocket, raised the knife up to his shoulder, picked up the money, and walked away. At that time, Gavin retrieved a piece of paper that had fallen out of the man's pocket–a Social Security card issued to Jeremiah Brinson–and brought it to the police. At about 2:30 a.m, the police observed a man matching the description given by Gavin about one-tenth of a mile from the crime scene. The police picked this man up and transported him to the police station, where he identified himself as Brinson and gave his Social Security number, which happened to match the information on the card found by Gavin.

Brinson, on the other hand, testified that Gavin had asked for a ride from him and his friends Richardson and Dunson.[5] Later during the car ride, Gavin asked Brinson about buying a "dime bag of weed." After Brinson's friend dropped them off, Gavin followed Brinson, persistently asking him to buy drugs. Brinson, fearful that Gavin was a "narc," hurried away from him. Brinson explained that he used the razor knife in his employment to cut carpet and that he had taken the knife out and put it on the car seat after Gavin had gotten into the automobile so as not to break the knife by sitting on it.

The jury is exclusively responsible for determining the credibility of a witness, and a habeas court may not revisit the fact-finder's credibility determinations. *Marshall v. Lonberger*, 459 U.S. 422, 432-35 (1983); *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993).  A reviewing court may not "'reassess the fact specific credibility judgments by juries or . . . weigh conflicting testimony.'" *Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996) (quoting *Anderson v. Senkowski*, 1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992)). Here, after hearing

---

[5] The third passenger, Dunson, did not testify at trial.

Brinson's judicially-truncated version of events, the jury chose to credit the prosecution witnesses' testimony and convict him. While this Court may not second-guess the factfinder by choosing Brinson's version of events over the prosecution's, *see, e.g.*, *Marshall v. Longberger*, 459 U.S. at 434 (1983) (holding that "federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them); *Jackson v. Virginia*, 443 U.S. at 326 (holding that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution"), I can examine the trial court's rulings that controlled the manner in which the factfinder heard the evidence. Ordinarily, pursuant to *Jackon v. Virginia*, I must defer to the jury's resolution of any questions of witness credibility. Thus, if a jury entirely discredited a petitioner's testimony, and drew all inferences in favor of the prosecution in a case lacking the serious flaws I have found in this one, then I would not be permitted to say that it was irrational for them to find sufficient evidence to support the conviction. However, as will be discussed later in this opinion, while there may be sufficient evidence to convict Brinson on the trial record, insofar as what he was actually permitted to present to the factfinder, Brinson was prevented from developing his theory of the case by erroneous trial court evidentiary rulings.

**4.      Prosecutorial misconduct**

Brinson contends that the prosecutor committed misconduct during his summation by suggesting that the petitioner had a motive to lie; making derogatory remarks about petitioner's "fancy suits"; and commenting on petitioner's failure to call a witness. *See* Petitioner's Appellate Brief at 10, 18-91, attached as Exhibit A to Respondent's Reply Declaration (Docket #20). On

direct appeal, the Appellate Division held that most of the alleged instances of misconduct had not been preserved for review and declined to review them as a matter of discretion in the interest of justice. *People v. Brinson*, 265 A.D.2d at 880, 697 N.Y.S.2d at 222 (citing N.Y. Crim. Proc. Law §§ 470.05(2), 470.15(6)(a)).[6] The court further found that those instances that were preserved for review did not warrant reversal. *Id.*

The Supreme Court has recognized that prosecutorial misconduct may "'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). To rise to the level of a due process violation, the prosecutor's misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985) (in turn quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976))). On habeas review, a federal court is charged with distinguishing between ordinary trial error and the type of "egregious" misconduct that amounts to a denial of constitutional due process. *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir.1990) (citing *Donnelly v. DeChristoforo*, 416 U.S. at 647-48); *United States v. Modica*, 663 F.2d 1173, 1178-81 (2d Cir. 1981) (*per curiam*), *cert. denied*, 456 U.S. 989 (1982)). Three factors are considered in determining whether a prosecutor's summation created "substantial prejudice": "'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction

---

[6] Arguably, the state court's reliance a state procedural rule to reject some of Brinson's claims of prosecutorial misconduct creates a procedural default. *See Fernandez v. Leonardo*, 931 F.2d 214, 215 (2d Cir. 1991) (citing N.Y. Crim. Proc. Law § 470.05(2)). However, respondent has failed to raise the affirmative defense of procedural default and thereby has waived it. *See Larrea v. Bennett*, 2002 WL 1173546, at *12 n.15 (S.D.N.Y. May 31, 2002) (citing *Hooks v. Ward*, 184 F.3d 1206, 1216 (10th Cir. 1999) ("[S]tate-court procedural default . . . is an affirmative defense, and . . . the state is 'obligated to raise procedural default as a defense or lose the right to assert the defense thereafter.'") (quoting *Gray v. Netherland*, 518 U.S. 152, 165-66 (1996)). Accordingly, the Court will consider all of Brinson's claims of prosecutorial misconduct on the merits.

absent the improper statements.'" *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998)

(quoting *Floyd*, 907 F.2d at 355 (in turn quoting *United States v. Modica*, 663 F.2d at 1181)). In

order for a prosecutor's comments in summation to warrant habeas relief, the "cumulative effect"

of the challenged statements must have been so "inflammatory or egregious" as to "require a

finding of substantial prejudice." *Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990) (finding

that the prosecutor's improper behavior, limited as it was to the summation, did not permeate the

trial, and holding that "[t]he clear evidence of guilt demonstrates that [petitioner] was not

prejudiced by the prosecutor's improper remarks") (citations omitted).

　　　Near the start of his summation, the prosecutor commented that Brinson was trying "to

pull the wool over [the jury's] eyes, just as he was working on May 28th, 1997, to steal some

money, to rob some money for whatever use, probably to use it to buy some cocaine in the city of

Geneva." T.202. The court sustained defense counsel's objection to this improper remark. After

arguing that the complainant did not have a motive to lie, the prosecutor asked, "Who had a

motive to lie here? The defendant." The court overruled counsel's objection.  The Appellate

Division held that the prosecutor's comment that Brinson had a motive to lie was made in

response to defense counsel's attack on the complainant's credibility. *People v. Brinson*, 265

A.D.2d at 880, 697 N.Y.S.2d at 222. The Supreme Court has recognized the so-called "invited

response" rule–that in properly assessing a claim of prosecutorial misconduct, "the reviewing

court must not only weigh the impact of the prosecutor's remarks, but must also take into account

defense counsel's opening salvo." *United States v. Young*, 470 U.S. 1, 12-13 (1985); *accord*

*Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (finding no substantial prejudice, in part

because "[m]uch of the objectionable content was invited by or was responsive to the opening

summation of the defense"). However, the Supreme Court also made clear that the "invited response" rule was not an invitation for prosecutors to go "out of bounds." *Id.* As the state court noted, defense counsel argued that the complainant fabricated the story about the robbery because he was drunk and angry that Brinson had stymied him in his attempt to buy drugs. Thus, the prosecutor was not "out of bounds" in responding by arguing that Brinson, and not the complainant, had a motive to lie. As one district court has pointed out, "[c]riminal trials often involve irreconcilable testimony, and an argument that a defendant--or any other witness, for that matter--lied under oath is not something courts should be squeamish about." *Smith v. Walsh*, No. 00-CV-5672 (JG), 2003 WL 22670885, at *5 (E.D.N.Y. Oct. 20, 2003) ("[T]hat [the prosecutor] called [the petitioner] a liar in summation does not amount to misconduct warranting habeas relief.") (citing *Jones v. Keane*, 250 F. Supp.2d 217, 236-37 (W.D.N.Y. 2002)); *see also United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) ("Prosecutors have greater leeway in commenting on the credibility of their witnesses when the defense has attacked that credibility.") (citing *United States v. Perry*, 643 F.2d 38, 51 (2d Cir. 1981) ("[I]n light of the fact that the defense lawyers attacked the credibility and honesty of the Government's case in their closings, the Government's statements vouching for witnesses were understandable if not laudable.")).

The prosecutor then questioned whether petitioner was wearing "those nice fancy suits that he's been wearing" at trial when he committed crimes in the past and made several other sarcastic remarks about petitioner's apparel. T.202, 203, 210. The court overruled defense counsel's objections. On direct appeal, the court agreed that these "derogatory references" were "improper," but that they were "not so egregious as to deny defendant due process of law." *People v. Brinson*, 265 A.D.2d at 880, 697 N.Y.S.2d at 222. The Court agrees that the

prosecutor's comments in this regard, taken alone, were ill-advised but not so prejudicial that they denied petitioner a fair trial. The prosecutor then asked, "Can we ever look inside the mind of this defendant, know what's going on in it? I wouldn't want to, but actions speak louder than words." The trial court sustained defense counsel's objections and struck the statement insofar as it referred to what the prosecutor wanted to do. T.213. Likewise, this statement, although improper, does not warrant reversal of petitioner's conviction.

Finally, the prosecutor stated that the defendant was "pushing a version of events in which supposedly he's out driving around with someone, one friend that came in, and his testimony was to be stricken because he couldn't identify anyone or had nothing credible to say." It appears that the prosecutor's remarks were not even true. The testimony of Richardson, about whom the prosecutor was referring, was stricken, in this Court's view improperly, based upon relevance, not on credibility. Moreover, the record is devoid of any suggestion that Richardson could not identify the complainant or even had an opportunity to identify the complainant.  The prosecutor next commented, "Does the defendant bother bringing in the other person or persons he's riding around with?" T.214. The court overruled defense counsel's objection. The Appellate Division held that the comment "was merely an effort to persuade the jury to draw inferences that supported the People's position and not an impermissible effort to shift the burden of proof." *People v. Brinson*, 265 A.D.2d at 880, 697 N.Y.S.2d at 222 (citations and internal quotation marks omitted). Though, in this Court's opinion, the decision to do so is unwise, it is settled law in this Circuit that the state may comment on a defendant's failure to call witnesses or produce evidence to support defense theories. *See United States v. Bautista*, 23 F.3d 726, 733 (2d Cir. 1994) (citing cases). In *Bautista*, the prosecutor commented that "[t]he defense does not have a

burden of proving anything to you but when they do make an argument to you . . . you don't have to accept it. At that point they are obligated to come forward with evidence." The Second Circuit found that although the comment was "inapt," when "considered in context" it "would not have been understood by a reasonable jury as anything more than an argument that the jury need not believe uncorroborated defense theories." *Id.* Further, the court in *Bautista* found that whatever ambiguity may have been caused by the remark with respect to the burden of proof was "undoubtedly clarified" by the court's instruction that the government bore the burden of proof as to every element and that the burden never shifted to the defendants, *id.*; such an instruction was given by the court at Brinson's trial.

Here, although the assistant district attorney certainly did not distinguish himself at Brinson's trial and should have refrained from making the challenged comments, I do not find that the misconduct was so egregious that it amounted to a denial of due process. This Court concedes that some of the prosecutor's remarks in fact were not improper, and the trial court sustained some of defense counsel's objections. Thus, while the prosecutor's comments did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process," *Darden v. Wainwright*, 477 U.S. at 181 (internal quotation marks and citation omitted), this Court is disturbed by the cumulative effect of the prosecutor's remarks and the trial court errors discussed more particularly below, which this Court believes combined to deny the petitioner a fair trial.

**5.     Denial of Sixth Amendment Right of Confrontation**

**a.     Analysis of Confrontation Clause Error**

**i.      Limitation of Cross-Examination of Complainant**

Brinson asserts that he was denied his Sixth Amendment right of confrontation due to the

trial court's erroneous limitation of defense counsel's cross-examination of the complainant,

Gavin, regarding racist remarks purportedly made by Gavin during the summer of 1997, shortly

after the incident. During cross-examination, defense counsel attempted to cross-examine the

complainant about his allegedly having been fired from his food service job at Perkins Restaurant

for refusing to serve African-American patrons. Gavin stated that he was "not definite of the

date" that he worked at Perkins, but that it was after the alleged robbery on May 28, 1997. The

prosecutor objected on the ground that this line of testimony was "not relevant." The trial court

agreed and did not allow defense counsel to ask Gavin whether he had been fired from Perkins.

Defense counsel then asked to make an offer of proof outside the presence of the jury, and the

following colloquy occurred:

> The Court:          Okay. Mr. Winthrop, your question, the last question of the
>                     witness, as the Court recalls, was whether or not the
>                     witness was fired from a job at Perkins in Geneva
>                     sometime after May 28th, 1997. You didn't phrase it that
>                     way, but that's the Court's impression of the timeframe. . . .
>                     This Court initially sustained an objection because it had
>                     absolutely nothing to do with what happened on May 28th,
>                     1997, to include the state of mind of the victim. Now, you
>                     tell me how you are delving into something after that and
>                     how it's relevant to the issues in the case.
>
> Mr. Winthrop:       Judge, I'm relying on . . . Richardson, Section 491 and 492,
>                     that bias, interest or hostility of a witness is not a collateral
>                     movement [*sic*] and may be proved in spite of the witness'
>                     denial[.] . . . We are talking about an issue of bias; and the
>                     possibility - - the probability, as far as we are concerned,
>                     we can demonstrate that this witness is a racist; that he, in
>                     fact, was fired from his job at Perkins at or near the time

> because I don't have any dates from him as to when he was
> working for these people, and . . . he was specifically fired
> because he refused to wait on black people; and as a matter
> of fact, he told his supervisor he's not serving any fucking
> Niggers. Now, that is the statement I am going to get from
> Mr. Gavin.

T.59. The trial court continued to focus on defense counsel's inability to narrow down the date

on which Gavin allegedly was working at Perkins; defense counsel admitted that he did not know

when exactly Gavin worked there but insisted that it was "sometime near the time of the

incident" T.60. The court responded, "You have to be specific." *Id.* The prosecutor argued that

"[a]nything that happen[ed] after May 28th is not relevant." T.61. The trial judge decided that

defense counsel would be allowed to question the complainant "in regards to his employment at

Perkins, as to when it occurred first[.]" T.62. The court further stated that it would entertain

objections with respect to that line of questioning in the event the complainant testified that he

did not begin working there until after the date of the incident (May 28, 1997). T.62.

When defense counsel resumed his cross-examination, Gavin testified that he began

working at Perkins in "late July" of 1997 and worked there for about "[a] month and a half[.]"

T.65. He could not provide a specific start-date or end-date with regard to his employment at

Perkins. Gavin testified that his duties at Perkins included washing dishes and busing tables; he

denied that he was supposed to wait on customers. T.67. Gavin testified that he "very seldom"

worked with Gary Cornue ("Cornue"), the assistant manager who allegedly fired him. T.67.

Defense counsel was not permitted to ask on how many occasions Gavin worked for Cornue

since the court sustained the prosecutor's objection on relevancy grounds. T.68.

Thereafter, defense counsel began questioning Gavin about the night of the incident,

when Gavin allegedly made several racist comments to Brinson when he saw Brinson in the company of the police. T.68. Counsel asked Gavin if it were true that he yelled at Brinson, "[C]ome here, come here, Nigger." Gavin replied that it was "absolutely a lie." T.68. Gavin likewise denied that he yelled, "Nigger, Nigger" as Brinson was led away by the police. T.69. Notwithstanding his commendable but futile efforts to place this evidence before the jury, faced with those denials and the inability to use any extrinsic evidence of Gavin's alleged racial hostility, defense counsel was forced to move on to another line of questioning.

### ii.   Exclusion of Extrinsic Evidence of Alleged Racial Bias of Complainant

After the close of the prosecution's case, defense counsel again tried to introduce evidence of the complainant's alleged racial bias and made an offer of proof to have Gary Cornue testify. The court refused to entertain the request unless defense counsel ascertained when exactly Gavin worked with Cornue at Perkins. After conferring with the witness, counsel informed the court that Gavin worked there from July 9, 1997, until August 2, 1997. T.121. The prosecutor objected to calling Cornue on the basis that any racist statements made by Gavin at Perkins were "after the fact" and there was "no showing of any racial bias whatsoever at the time of this incident." T.121. The prosecutor argued that it was "peripheral, collateral" and that if the evidence were admitted, they would have a "minitrial with respect to complainant's employment." T.122. The trial court agreed.

Defense counsel then sought to call June Orbaker ("Orbaker"), a woman who alleged that she lived with Gavin "between late May and early June." (On cross-examination, Gavin had admitted that Orbaker was an acquaintance but denied having lived with her.) According to

defense counsel, Orbaker would have testified that about a month prior to trial, Gavin told her that "all the Niggers who came into Rite Aid knew that he's the one that had accused Jeremy [*sic*] Brinson." T.122-23. The prosecutor objected on the basis that it was "[c]ollateral, irrelevant . . . not material." T.123. The court agreed that it was "[n]ot relevant," stating that there was "no indication or innuendo . . . by defense counsel on cross examination that there [was] any change in any of [Gavin's] testimony based on any - - for any reason from what he first said on the 28th until the date of trial." T.123.

On direct appeal, the Appellate Division held that the limitation on defense counsel's cross-examination of the complainant was proper, but for different reasons than those on which the trial court relied:

> County Court properly limited defendant's cross-examination of complainant regarding his racial bias. The proof sought to be introduced was inadmissible because it concerned the alleged general ill will of complainant and not his specific hostility toward defendant. Thus, under the circumstances of this case, the risk of confusing the jury outweighed the probative value of the proof.

*People v. Brinson*, 265 A.D.2d at 880, 697 N.Y.S.2d at 222 (citations omitted).

### iii.   Applicable Legal Standard for Review of Confrontation Clause Errors

The Confrontation Clause "provides two types of protection for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). Of particular relevance to this case, the Supreme Court has recognized that "'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" *Van Arsdall*, 475 U.S. at

-30-

678-79 (quoting *Davis v. Alaska*, 415 U.S. 308, 315 (1974)). "[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable." *Ritchie*, 480 U.S. at 51 (citing *United States v. Abel*, 469 U.S. 45, 50 (1984); *Davis*, 415 U.S. at 316)).

Generally speaking, the defendant's right to confront his accusers "is satisfied if defense counsel receives wide latitude at trial to question witnesses." *Ritchie*, 480 U.S. at 51 (citation omitted). In short, the Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Van Arsdall*, 475 U.S. at 679 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam*) (emphasis in original). *See also Ohio v. Roberts*, 448 U.S., at 73, n. 12 (noting that except in "extraordinary cases, no inquiry into 'effectiveness' [of cross-examination] is required").  "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. However, in exercising its discretion in precluding or limiting cross-examination, a court may not abuse its discretion.

In *Davis v. Alaska*, the Supreme Court noted that in addition to cross-examining a witness concerning a prior crime, a "more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." The *Davis* court further observed that "partiality of a witness is subject to exploration at trial, and

is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Id.* (quoting 3A J. WIGMORE, EVIDENCE § 940, p. 775 (Chadbourn rev. 1970)). "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* (citing *Greene v. McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 1413, 3 L. Ed.2d 1377 (1959)).  Moreover, in most modern jurisdictions, proof of bias is rarely collateral and is almost always relevant. The Supreme Court has explained that

> [b]ias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony. The "common law of evidence" allowed the showing of bias by extrinsic evidence, while requiring the cross-examiner to "take the answer of the witness" with respect to less favored forms of impeachment.

*United States v. Abel*, 469 U.S. 45, 52 (1984) (citing E. CLEARY, MCCORMICK ON EVIDENCE § 40, p. 89 (3d ed. 1984); Hale, Bias as Affecting Credibility, 1 HASTINGS L.J. 1 (1949)). In the present case, the trial court precluded cross-examination of the complainant about whether he had been terminated from his employment at Perkins for refusing to serve African-American patrons. The court agreed with the prosecutor that the testimony was not relevant and was collateral since the complainant was not working at Perkins at the time of the alleged robbery, and that anything that happened during his employment there was "after the fact." The trial court seemed fixated on placing on defense counsel an arbitrary and unwarranted burden of coming up with the precise dates of the complainant's employment at Perkins, when the complainant testified that he could not remember the precise dates. Moreover, as previously discussed, the

trial court precluded Brinson from calling two extrinsic witnesses to impeach the complainant based on relevance.  Then, the Appellate Division held that because the testimony did not concern the complainant's specific hostility toward Brinson, the risk of confusing the jury outweighed the testimony's probative value. Thus, unlike the trial court, the appellate court implicitly held that the evidence was relevant although ultimately inadmissible.

In *Delaware v. Van Arsdall*, the Supreme Court held that a defendant "states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" 475 U.S. at 680 (quoting *Davis*, 415 U.S. at 318). In *Van Arsdall*, the trial court "prohibited *all* inquiry into the possibility that Fleetwood [one of the prosecution's sixteen witnesses] would be biased as a result of the State's dismissal of his pending public drunkenness charge." 475 U.S. at 679 (emphasis in original). By "cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony," the trial court's ruling violated petitioner's Confrontation Clause rights. *Id.* at 679. Furthermore, the petitioner met his burden of proving that "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." *Id.* at 680.

Similarly, in *Davis v. Alaska,* the petitioner was charged with stealing a safe, which was found abandoned near the home of Richard Green. Green testified at trial that he had seen Davis engaged in suspicious activity near this site on the day of the crime. Defense counsel was

prevented from eliciting on cross-examination that Green was on juvenile probation for burglary both at the time of his pre-trial identification of Davis and at the time of trial. The defense sought to imply that Green may have slanted his testimony in the prosecution's favor "either to shift suspicion away from himself or to avoid revocation of probation for failing to 'cooperate.'" 415 U.S. at 310-11.

With these precedents in mind, I turn to the question of whether the Appellate Division unreasonably applied clearly established Supreme Court precedent in holding that defense counsel's cross-examination of the complainant concerning his racial hostility was properly limited because the excluded testimony concerned the complainant's general ill will and was not directed at the petitioner specifically. Although to some it may be a close question, in the end, the Court must conclude that a clear error of constitutional magnitude result from the trial court's ruling. Even though the petitioner here was not wholly prohibited from questioning the complainant about his potential racial prejudice, unlike the defendants in *Davis* and *Van Arsdall*, the limitations placed on his cross-examination by the trial court completely prohibited petitioner from challenging the complainant's denials during the earlier portions of his cross-examination[7] and rendered defense counsel's effort to show the virulent prejudice allegedly exhibited by the complainant meaningless. Had defense counsel been permitted to pursue his proposed line of cross-examination, a "reasonable jury might have received a significantly different impression of [the complainant's] credibility[.]" *Van Arsdall*, 475 U.S. at 680. Had I been presiding over

---

[7] As discussed above, Brinson testified that the complainant on the night of the incident twice called him a "nigger." Defense counsel questioned the complainant about these statements on cross-examination, but the complainant denied making them. As discussed above, Brinson should have been permitted to collaterally attack complainant's denials.

Brinson's trial, I unequivocally would have permitted defense counsel to pursue questioning the complainant about his allegedly having been fired for refusing to serve black patrons. Then, upon the complainant's denial of such a circumstance, I would have permitted defense counsel to call the manager of the restaurant as well as the former girlfriend of the complainant to testify regarding their knowledge of the complainant's alleged racism.

It is true that the issue on habeas review is not whether I, in my independent judgment, conclude that the relevant state-court decision applied clearly established federal law "erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. at 411. Rather, to be "unreasonable," the state court's application of federal law must reflect "[s]ome increment of incorrectness beyond error," although that "increment need not be great." *Henry v. Poole*, 409 F.3d 48, 68 (2d Cir. 2005) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). I am compelled to find such incorrectness in this case. In my view, there is an increment of incorrectness "beyond error" and I find that it is significant.  First of all, it is without question that the evidence of racial prejudice was admissible.  It appears that the Appellate Division conceded its relevance when it shifted ground and justified the exclusion of the evidence on the basis that it would "confuse" the jury because the testimony failed to specify Brinson as the target of the complainant's prejudice. I do not find such a requirement to be efficacious. I fail to see how impeachment of a virulently racist complainant could cause jury confusion–generalized racism toward one race certainly could allow a jury to infer logically and reasonably that such strong prejudice against one race possessed by an individual could motivate that person to act specifically against a member of that race.

Secondly, in addition to prohibiting cross-examination of the complainant about his

conduct at the restaurant from which he was allegedly terminated on the basis that it was

collateral, the trial court believed that it failed to show racial prejudice at the time of the alleged

crime. Common sense would dictate that if a witness denied under oath that he called a defendant

a "nigger," impeaching evidence that he suffered a termination of employment rather than agree

to serve black people would raise critically serious questions about his credibility.  At the same

time, it would provide persuasive evidence of a motive to fabricate.  This Court knows of no

precedent requiring proof of state of mind of motive requiring that such state of mind coincide

with a crime or a fabrication. Motive for fabricating a story might not be immediately apparent

and might only reveal itself sometime after the fact.  The complainant's conduct would logically

suggest that he possessed a deep-seated, long-standing racial hatred that surely was not formed

only in the approximately two months following the alleged robbery, but existed for some time

prior to the alleged robbery.  Nevertheless, this was for the jury to evaluate, not the trial court.

This was unquestionably relevant evidence, which any trier of fact could have understood

without confusion.  So persuasive is evidence that an individual would rather suffer an

employment termination than surrender his racial hatred or, for that matter, even just conceal it,

that its exclusion deprived the defendant of critical evidence that could have allowed the trier of

fact to conclude that the complainant fabricated the robbery accusation.  When coupled with the

striking of the entire testimony of Richardson, the only witness the petitioner had to corroborate

his version of the facts surrounding his encounter with the complainant, the trial court erected an

unfair wall of such constitutional dimension as to require a grant of Brinson's petition.

Moreover, defense counsel's own inconsistent efforts and the numerous instances of

prosecutorial misconduct, while not in themselves a basis for overturning Brinson's conviction,

cumulatively added to the unfairness of the trial.  A new jury might or might not convict Brinson

at a new trial; but whatever its findings, it should only do so after viewing and judging this

contest on a level playing field.

> ### b.        Harmless error analysis

I have found that the trial judge improperly curtailed cross-examination so as to have

violated Brinson's confrontation rights. I am obligated to examine whether habeas relief would

not be warranted because any error would have been harmless. The Supreme Court has explained

that when a reviewing court finds error under the Confrontation Clause, it should not reverse

automatically but should instead apply harmless-error analysis. *Van Arsdall*, 475 U.S. at 683

(holding that *Davis v. Alaska* does not support an automatic reversal rule). The Supreme Court

has articulated two different tests for determining whether an error may be overlooked by reason

of its harmlessness.  *Brown v. Keane*, 355 F.3d 82, 91 (2d Cir. 2004).  In *Brecht v. Abrahamson*,

the Court held that on *collateral* review of a state conviction, an error will be found to be

harmless if it did not have a "'substantial and injurious effect or influence in determining the

jury's verdict.'" 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

(1946)). In *Chapman v. California*, the Supreme Court held that on *direct* review of a criminal

conviction, an error may be overlooked only if it is "harmless beyond a reasonable doubt." 386

U.S. 18, 24 (1967). Following the passage of AEDPA, the Second Circuit repeatedly has

questioned whether the "applicable test on habeas review of a state conviction remains the one

set forth in *Brecht*, or instead should be a determination whether the state court's decision was

contrary to, or involved an unreasonable application of *Chapman*," but has declined to decide the

question because it concluded that the result was the same under either test. *Brown*, 355 F.3d at

91 (internal quotation marks and citations omitted); *accord, e.g., Howard v. Walker*, 406 F.3d 114, 124 (2d Cir. 2005); *Benn v. Greiner*, 402 F.3d 100, 105 (2d Cir. 2005); *Cotto v. Herbert*, 331 F.3d 217, 253 (2d Cir. 2003); *Ryan v. Miller*, 303 F.3d 231, 254 (2d Cir. 2002); *Noble v. Kelly*, 246 F.3d 93, 101 n. 5 (2d Cir.), *cert. denied*, 534 U.S. 886 (2001); *Loliscio v. Goord*, 263 F.3d 178, 185 n. 1 (2d Cir. 2001). The Second Circuit settled at least a part of this question by holding in *Gutierrez v. McGinnis* that "when a state court *explicitly conducts harmless error review* of a constitutional error, a habeas court must evaluate whether the state unreasonably applied *Chapman*." 389 F.3d 300, 306 (2d Cir. 2004) (emphasis supplied).

Here, however, the issue of harmless error was never reached in the state courts because the Appellate Division found that no constitutional error had been committed at Brinson's trial. *See People v. Brinson*, 265 A.D.2d at 880, 697 N.Y.S.2d at 222. The Second Circuit has yet to decide the harmless error standard to apply where, as here, the state courts did not engage in harmless error review. *See Gutierrez*, 389 F.3d at 306 ("We do not presently reach the issue of whether or how to apply *Brecht* where the state court has not engaged in harmless error review, as, of course, those facts are not before us.") (footnote omitted); *see also Benn*, 402 F.3d at 105 (post-*Gutierrez* case declining to decide the harmless error standard to be applied "in the absence of a state court adjudication of harmlessness"). It therefore remains an "open question" in this Circuit which harmless error standard should be applied under these circumstances. *E.g., Benn*, 402 F.3d at 105 (citing *Rosa v. McCray*, 396 F.3d 210, 226 (2d Cir. 2005) (Straub, J., concurring in part and dissenting in part)).

As the Supreme Court has recognized, proving that a trial error was harmless under the *Brecht* standard is "less onerous" than proving that a trial error was harmless under *Chapman*.

*See Brecht*, 507 U.S. at 637; *accord, e.g., Gutierrez*, 389 F.3d at 303; *Benn*, 402 F.3d at 105

(noting that the *Chapman* standard is "more defendant-friendly") (citations omitted). As a result,

if the state were able to carry its burden of proving that the error committed at trial was harmless

under the more stringent *Chapman* standard, it certainly could carry its burden of proving

harmlessness under *Brecht*'s more lenient standard. *Benn*, 402 F.3d at 105 (citing *Gutierrez*, 389

F.3d at 305 (noting that "*Chapman* is considerably more generous to prejudiced defendants than

is *Brecht*" since "*Chapman*, after all, requires a reviewing court to be convinced beyond a

reasonable doubt that the error was harmless, while *Brecht* requires a reviewing court to identify

a substantial and injurious effect on the verdict") (footnote omitted).

When presented with a Confrontation Clause error, "[t]he correct inquiry is whether,

assuming that the damaging potential of the cross-examination were fully realized, a reviewing

court might nonetheless say that the error was harmless. . . ." *Van Arsdall*, 475 U.S. at 684;

*accord, e.g., Benn*, 402 F.3d at 105-06. The principal factors to be considered in assessing the

effect of the error are the importance of the witness's testimony; whether that testimony  was

cumulative; the presence or absence of evidence corroborating or contradicting the testimony of

the witness on material points; the extent of cross-examination otherwise permitted; and the

strength of the evidence against the defendant. *Van Arsdall*, 475 U.S. at 684 (citations omitted).

The damage to Brinson's case by the trial court rulings cannot be overemphasized.  On

the strength of only one witness--an alleged virulent racist and the only witness to the alleged

crime available to the prosecution--Brinson was convicted of robbery and then sentenced to

eighteen years in prison.  Although, as discussed above, there was some cross-examination

concerning the witness' bias in that defense counsel was permitted to question the complainant

about racist epithets he allegedly had used on the night of the incident, the cross-examination was rendered meaningless because Brinson was prevented from asking the foundational question as to whether the complainant had ever suffered a termination from employment for refusing to wait on black people. Compounding this error was the trial court's refusal to allow any impeachment witnesses to contradict the complainant's denials of his alleged use of racial epithets and his termination from employment due to his expressions of racial hostility, as counsel was permitted to do under applicable law.

As discussed above, although the evidence introduced at trial may have been sufficient to convince a rational trier of fact of Brinson's guilt–a hurdle that was not terribly difficult to scale given the trial court's evidentiary rulings–the proof against him was not overwhelming.  There was physical evidence linking Brinson to the crime–namely, the razor knife and the Social Security card, but the complainant easily could have observed the razor knife consistent with Brinson's version of the facts as Brinson had testified that it was visible while the complainant was inside the automobile. Although we may never know the true story concerning the Social Security card, the jury should have had the opportunity to evaluate Gavin's version of how he found the card in light of the significant issues surrounding his credibility; the jury might very well have rejected his story that he found the card laying on the street. Had the jury been permitted to hear the evidence concerning the complainant's alleged racial hostility, there is a reasonable likelihood that it would have decided that the complainant was not credible and could have accepted Brinson's version of the encounter between the two. Thus, the *Van Arsdall* factors compellingly support a finding that Brinson's trial was marred by serious errors by the trial court in preventing the petitioner's efforts to effectively cross-examine the allegedly racially hostile

complainant and to introduce impeachment evidence to demonstrate that the complainant was untruthful in denying his racial hostility.

In sum, this is a case in which only two people know the truth. There were no witnesses to the alleged crime other than the petitioner and the complainant. The "damaging potential," *Van Arsdall*, 475 U.S. at 684, of the most important cross-examination and extrinsic evidence to impeach was not only limited, but precluded entirely. Had the cross-examination been "fully realized," *id.*, it would have had a substantial chance of affecting the trial's outcome. This is because the excluded testimony would have provided additional, compelling proof from which the jury could infer that the complainant was a racist, under the facts of this case. The jury likely would have determined first, that the complainant was lying when he testified that he did not call Brinson a "nigger" as the police were apprehending him, and second, that the complainant had a motive to fabricate the robbery because of his extreme racial hostility. Thus, the prohibited line of questioning could have done "[s]erious damage to the strength of the State's case." *Davis v. Alaska*, at 319. In short, the Confrontation Clause error cannot said to be harmless under either the *Chapman* or *Brecht* standard: Not only has Brinson shown that the Confrontation Clause error had a substantial and injurious effect on the verdict, *see Brecht*, *supra*, I am convinced beyond a reasonable doubt that the error was not harmless, *see Chapman*, *supra*.

## CONCLUSION

Jeremiah Brinson's petition for a writ of habeas corpus is granted based on petitioner's claim that his Confrontation Clause rights were violated by the trial court's decision to preclude cross-examination of the complainant concerning his alleged racial hostility. The prisoner shall

be released unless within sixty (60) days the state commences prosecution. This decision is stayed until all appellate proceedings are completed and a final mandate is received by this court.

No certificate of appealability is granted with respect to Brinson's remaining claims, petitioner having made no substantial showing of the denial of a constitutional right. Brinson is reminded that he may seek a certificate of appealability on these claims from the Court of Appeals for the Second Circuit.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      January 5, 2006
            Rochester, New York.